UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                                                Chapter 11

      METERED APPLIANCES INC.,                  Subchapter V

      Debtor.                                             Case No. 25-73481 (JPM)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEBTOR'S RESPONSE IN OPPOSITION TO THE MOTION OF THE UNITED STATES TRUSTEE TO CONVERT THIS CASE TO CHAPTER 7 OR, IN THE ALTERNATIVE, TO DISMISS, AND TO THE SUPPLEMENT THERETO

Metered Appliances Inc., the debtor and debtor in possession herein (the **"Debtor"**), by its counsel, Law Offices of Charles Wertman P.C., respectfully submits this response (the **"Response"**) in opposition to the motion of the United States Trustee (the **"United States Trustee"**) to convert this case to a case under chapter 7 of title 11 of the United States Code (the **"Bankruptcy Code"**) or, in the alternative, to dismiss, filed January 2, 2026 [ECF No. 21] (the **"Motion"**),and to the supplemental pleading in support thereof filed July 15, 2026 [ECF No. 70] (the "Supplement"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     At the outset, counsel for the Debtor acknowledges that this Response is being filed after July 23, 2026, the date fixed by the Court at the July 8, 2026 hearing. Counsel apologizes to the Court, to the United States Trustee, and to the other parties in interest.

2.     If the Court or the United States Trustee requires additional time to consider the matters raised here, the Debtor consents to an adjournment of the Motion or to a schedule for further submissions. The Debtor asks that these matters, several of which materially change the record, be before the Court rather than not before it at all.

3.     The delay is explained by what happened to the transaction in the weeks around the July

8 hearing, and counsel offers the chronology rather than an excuse.

4.      At the July 8 hearing counsel advised the Court that two parties had expressed interest in acquiring the Debtor's laundry room operations. The first had approached the Debtor after the motion to reject leases was filed. The second had been referred to the Debtor by the Subchapter V Trustee the previous day. Counsel told the Court that he had spoken with counsel to the second party twice, that he had explained that the Debtor was working against a very tight deadline, and that he expected to know by that Friday which party would be making the offer. Counsel also told the Court that the sale motion was prepared and required only the name of the purchaser and the numbers.

5.      That expectation was reasonable when it was stated, and it proved incomplete for a reason counsel did not anticipate. The purchaser that emerged, CPIL LLC, did not simply confirm the offer then on the table. It *enlarged* it. Its letter of intent of June 15, 2026 had addressed a single laundry room at 2020 East 41st Street, Brooklyn, at a price of $17,500. On July 14, 2026 it delivered a second letter of intent covering five additional locations at a price of $100,000, and forwarded the two sets of agreements to counsel on July 15, 2026. Each letter of intent afforded the Purchaser a diligence period of sixty days. Measured from the July 14, 2026 letter, that period would not expire until September 12, 2026. The Debtor has not taken the time available to it under the letters. It comes before the Court with definitive agreements circulated for signature, a purchase price fixed, and a motion to approve the sales, well in advance of the date on which the Purchaser's diligence period would have run.

6.      The Debtor had hoped for more. When the Purchaser first expressed interest, the Debtor understood that it might acquire a substantially larger number of the laundry room locations the

Debtor had identified as candidates for rejection, and the Debtor's expectation at the July 8 hearing was informed by that understanding. That is not how the diligence came out. Having inspected the locations, the Purchaser was prepared to acquire six of them and no more. The balance of the locations the Debtor is exiting have no purchaser, and the Debtor will address them as set forth below rather than represent to the Court that a buyer exists where none does.

7.      Copies of the two letters of intent are annexed hereto as **Exhibit A**. The Debtor annexes them so that the Court and the United States Trustee may see for themselves that the scope of the transaction changed on July 14, 2026, and that the delay described above is a matter of record rather than an assertion of counsel. The electronic mail messages transmitting the letters are not annexed. The letters of intent are non-binding by their terms, and they have been superseded by the two asset purchase agreements, which differ from the letters in certain respects. The agreements govern, and the terms described below and in the sale motion are the terms of the agreements rather than of the letters. The letters are annexed for a narrower purpose, which is to show when and by how much the scope of the transaction changed.

8.      The consequence was that the transaction counsel described to the Court on July 8 as needing only a name and numbers had become a materially different and larger transaction, covering six locations rather than one. The Purchaser is a laundry room operator rather than a financial buyer, and it was unwilling to commit to a location it had not seen. It visited the additional laundry rooms, inspected the equipment in place at each, and assessed the condition and economics of each before fixing which locations it would take and on what terms. That work could not be compressed, and the Debtor was in no position to demand that it be done faster at the risk of losing the only purchaser it had.

9.    Counsel states the matter plainly. Through the middle of July the Debtor did not know whether it had a case worth defending. The transaction was the Debtor's only realistic path to a confirmable plan, and until the Purchaser had inspected the locations and committed to terms, counsel could not know whether that path existed. Had the transaction failed, counsel would have moved to dismiss this case rather than oppose the United States Trustee's motion. It would have been neither honest nor useful to file a response defending a reorganization counsel could not see.

10.    It was only at a late hour, when it became clear that the transaction was going forward and counsel was able to work through a reorganization that the numbers would actually support, that there was a response worth filing. That is when this Response and the accompanying submissions were prepared. Counsel regrets that it left no margin, and offers the explanation for what it is: the delay was not inattention to the Court's date, but the absence, until then, of anything to say that would have assisted the Court.

11.    That work is now complete. The Debtor has determined which of the two interested parties would proceed, negotiated the terms of two asset purchase agreements with **CPIL LLC**, a New York limited liability company, and prepared the motion seeking this Court's approval of the sales.

12.    The delay had a further consequence, and it is the most significant development since the last hearing. Until the six locations were fixed, the Debtor could not calculate what section 365(b)(1) of the Bankruptcy Code would require to cure defaults at the affected buildings. When it did, the result changed the structure of the transaction.

13.    In the course of preparing that motion the Debtor reconciled, for the first time, the

amounts that would be required under section 365(b)(1) of the Bankruptcy Code to cure defaults at the six laundry room locations. Those arrears total approximately $106,715, against combined consideration of $117,500. Assuming and assigning all six agreements would have consumed substantially the entire purchase price in cure payments, left the estate with something on the order of $10,000, and paid two landlords in full in cash ahead of every other creditor in this case. The Debtor does not believe it could responsibly ask the Court to approve that, and it does not ask it.

14.     The arrears are, however, highly concentrated. Four of the six locations carry arrears of $16,600 in the aggregate; the other two carry $90,115. The Debtor will therefore assume and assign the four agreements it can afford to cure, paying each counterparty entitled to a cure the full amount of its arrears, and will reject the remaining two and sell the equipment at those locations, leaving the Purchaser to negotiate its own arrangements there. The rejection damage claims that result are treated with other general unsecured claims under the plan rather than paid in cash ahead of them.

15.     The Debtor discloses the reconciliation to the Court and to the United States Trustee as soon as it has been able to perform it. It is the product of the diligence described above, and it materially improves what the estate realizes. Cure falls from $106,715 to $16,600, and the estate retains on the order of $100,000 rather than something closer to $10,000.

16.     The Debtor will ask that both sales be approved free and clear of liens, claims, and encumbrances under section 363(f) of the Bankruptcy Code, with all liens to attach to the proceeds with the same validity, extent, and priority they now have against the assets sold. The Debtor does not ask the Court to determine the validity, priority, or amount of any lien in

connection with the sales, and no party's rights in the proceeds are impaired by the relief requested. The Debtor is in communication with the asserted secured creditors and will identify at or before the hearing the subsection of section 363(f) on which it relies as to each. The Debtor does not contend that the aggregate asserted secured debt is less than the sale price, and it does not rely on section 363(f)(3).

17.     The Motion should be denied. Two of the three grounds asserted by the United States Trustee identified real deficiencies, and both have been cured. The third does not describe this Debtor, and the Debtor answers it on the merits rather than by promising to fix it.

18. First, the monthly operating reports are current. The Debtor filed its report for June 2026 on July 28, 2026 [ECF No. 74], and every report through that date is now on file. The June report shows receipts of $98,685.20, disbursements of $78,386.84, positive net cash flow of $20,298.36, and cash on hand at June 30, 2026 of $53,325.13.

19.     Second, the Debtor's Second Amended Subchapter V Plan is being filed contemporaneously herewith. It contains both the liquidation analysis required by section 1190(1)(B) and the projections required by section 1190(1)(C), which are the items whose absence the United States Trustee correctly identified. That plan cures the deficiency on which this ground rests.

20.     Third, the continuing loss ground rests on a misreading of a single line of the Debtor's operating reports, and the June report filed on July 28, 2026 resolves it. Line 24 is a running cumulative total, not a balance owed at a point in time. Exhibit E to the June report sets out both figures side by side. The monthly amount unpaid was $29,905.00 in February, $29,537.34 in March, $28,772.34 in April, $27,584.34 in May, and $27,584.34 in June. It has declined in every

month. The running total, which is the number the United States Trustee cites, was $58,259.68 at April, $85,844.02 at May, and $113,428.36 at June, rising in each month by exactly $27,584.34.

21.     That figure of $27,584.34 is the Debtor's monthly obligation to Eastern Funding LLC, and Exhibit E identifies it as such. The Debtor has suspended payment on it deliberately, pending resolution of Eastern's late filed and disputed claim, and not for want of funds. The same exhibit shows unpaid rent of $3,002.08 in February, $1,953.00 in March, $1,188.00 in April, and zero in May and zero in June. The Debtor is current with its landlords and has been since May. The consequence is that the comparison at paragraph 8 of the supplemental pleading, which sets $85,844 of unpaid expenses against $33,086 of cash, compares four months of accrual to one month of cash. The amount actually unpaid at May 31, 2026 was $27,584.34, against cash on hand of $33,026.77. The Debtor could have paid it in full that day. Cash on hand has since risen to $53,325.13, and June produced positive net cash flow of $20,298.36. Section 1112(b)(4)(A) requires both a continuing loss and the absence of any reasonable likelihood of rehabilitation, and on this record neither is present.

22.     The Debtor does not seek an extension of the September 8, 2026 deadline fixed by this Court's order entered May 15, 2026. It asks only for the opportunity to complete a transaction that is now documented and ready to be noticed, and to confirm a plan funded by it within the time the Court has already allowed.

### RELEVANT BACKGROUND

23.     On September 9, 2025, the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor in possession. Salvatore LaMonica serves as the subchapter V trustee (the "Subchapter V Trustee").

24.    The Debtor operates coin- and card-operated interior laundry room facilities in residential buildings in the New York metropolitan area, pursuant to leases, licenses, and building agreements with the building owners.

25.    The Debtor filed its subchapter V plan on December 8, 2025 [ECF Nos. 19, 20], and filed its First Amended Subchapter V Plan, dated April 16, 2026, on April 17, 2026 [ECF Nos. 52, 53], which provides for a distribution to general unsecured creditors of not less than thirty-two percent. By order entered May 15, 2026 pursuant to 11 U.S.C. § 105(d)(2)(B) [ECF No. 58], the Court directed that the Debtor obtain confirmation of a plan by September 8, 2026.

26.    The United States Trustee filed the Motion on January 2, 2026 [ECF No. 21], asserting cause under sections 1112(b)(4)(A), (F), and (J) of the Bankruptcy Code.

27.    50 Brompton Owners Corp., a building owner, filed a response on March 4, 2026 [ECF No. 37], in which it asserted that the Debtor's monthly operating reports failed properly to list the Debtor's unpaid post-petition expenses. That assertion and the United States Trustee's continuing loss argument raise the same question about the same line of the same reports, and the Debtor addresses both below.

28.    At the July 8, 2026 hearing, the Court directed the United States Trustee to file a supplemental pleading in support of the Motion, which was filed on July 15, 2026 (the "Supplement") [ECF No. 70], directed the Debtor to respond by July 23, 2026, and adjourned the Motion, the subchapter V status conference [ECF No. 15], and the Debtor's motion to reject leases [ECF No. 40] to July 29, 2026.

**THE SALE TRANSACTION**

29.    As the Debtor reported to the Court at the June 24 and July 8, 2026 hearings, at each of

which the Subchapter V Trustee appeared, two parties expressed interest in acquiring the Debtor's laundry room operations, the second of whom was referred to the Debtor by the Subchapter V Trustee. Following the July 8 hearing the Debtor concluded negotiations with CPIL LLC (the "Purchaser"), which submitted the better of the two proposals. The Purchaser is not an insider of the Debtor and is not affiliated with the Debtor or any of its principals, and both agreements were negotiated at arm's length.

30.    The Debtor and the Purchaser have agreed upon the terms of two asset purchase agreements, circulated in definitive form and subject to execution, providing for the sale of the Debtor's laundry equipment, card systems, route records, and related personal property at six locations.

31.    Each sale is documented separately, and each carries its own promissory note. The Brooklyn transaction provides for $5,000 in cash at closing and a note in the principal amount of $12,500, payable in thirty-six monthly installments of $374.64. The portfolio transaction provides for $20,000 in cash at closing, a further $5,000 payable forty-five days after closing subject to verification of the income at the locations sold, and a note in the principal amount of $75,000, payable in thirty-six monthly installments of $2,247.82. Each note bears interest at five percent per annum. Each note is secured by a first priority lien on the assets sold under the agreement to which it relates, perfected by the filing of a financing statement, and each note and security agreement stands on its own. Neither transaction is conditioned on the other and neither note is cross defaulted against the other. Together the notes provide the estate, and following confirmation the reorganized Debtor, with $2,622.46 per month, or approximately $31,469 per year, in addition to operating income.

32.    The consideration is payable as follows:

| Transaction | Purchase Price | Cash At Closing | Post-Closing payment | Promissory Note | Monthly Installment |
|---|---|---|---|---|---|
| Brooklyn: 2020 East 41st Street | $17,500.00 | $5,000.00 | $0.00 | $12,500.00 | $374.64 |
| Portfolio: five locations | $100,000.0 | $20,000.00 | $5,000.00 | $75,000.00 | $2,247.82 |
| Total | $117,500.0 | $25,000.00 | $5,000.00 | $87,500.00 | $2,622.46 |

33.    The Debtor's motion under sections 363 and 365 of the Bankruptcy Code seeking approval of both sales is being filed contemporaneously herewith, on notice pursuant to Bankruptcy Rule 2002(a)(2). The Debtor will request that the Court waive the stays imposed by Bankruptcy Rules 6004(h) and 6006(d) so that closing may occur promptly upon entry of a sale order, and thus in time for the proceeds to fund distributions under a plan confirmed by September 8, 2026.

34.    The building agreements at the six locations will be treated in two ways, and the Debtor sets out its reasoning because the difference is material to what the estate realizes.

| Location | Treatment | Cure |
|---|---|---|
| 2020 East 41st Street, Brooklyn | Assume and assign | $0.00 |
| 150 Duncan Elder Drive | Assume and assign | $6,000.00 |
| 33-47 Floral Blvd | Assume and assign | $5,300.00 |
| 4 North Lewis Place | Assume and assign | $5,300.00 |
| Subtotal, agreements assumed and cured in full | | $16,600.00 |
| 301 East 79th Street | Reject | $39,580.00 |
| 750/730 West Broadway | Reject | $50,535.00 |
| Arrears at locations not assumed | | $90,115.00 |

| Total arrears at the six locations | | $106,715.00 |
| --- | --- | --- |

35.    As to the first four locations, the Debtor will assume the building agreements, assign them to the Purchaser, and pay the cure amounts in full at or promptly following closing. Those counterparties are made whole and their laundry rooms continue to operate without interruption. As to the remaining two, the Debtor will reject the agreements under section 365(a) effective at closing and sell the equipment located there free and clear under section 363. The Purchaser will negotiate its own arrangements with those two building owners at its own risk.

36.    The Debtor will cure in full, as section 365(b)(1) of the Bankruptcy Code requires, every agreement it assumes. It proposes to assume no agreement it cannot cure. At the two locations it does not assume, the agreements are rejected, no cure obligation arises, and the counterparties' claims, including any claim for damages arising from rejection, are treated with other general unsecured claims under the plan rather than paid in cash ahead of them. The Debtor remains in discussion with both counterparties, and if either agrees to a cure the estate can fund, the Debtor will assume and assign that agreement and advise the Court.

37.    This allocation pays in full every counterparty whose arrears the estate can afford to pay, preserves the operating value of the equipment at all six locations, and converts the two obligations the estate cannot afford into claims that share ratably with other unsecured creditors rather than ahead of them.

38.    The Debtor will conform its pending motion to reject leases [ECF No. 40] to this treatment, so that no agreement being assumed and assigned remains on the schedule of agreements proposed to be rejected. Of the six locations addressed above, only 4 North Lewis Place appears on Exhibit A to that motion and is now proposed to be assumed, and the Debtor

will amend Exhibit A to remove it. 301 East 79th Street also appears on Exhibit A and is being rejected, which is consistent with the treatment set forth above and requires no amendment. The remaining four locations do not appear on Exhibit A.

39.     As to the balance of the locations, the Debtor does not ask this Court for further time. Those locations have been marketed. The Purchaser inspected them and elected to acquire six. The Debtor is not aware of any other party prepared to buy the remainder, and it will not ask the Court to hold a motion in abeyance on the possibility that one appears. The Debtor will instead ask that the agreements at those locations be rejected effective on a date certain, approximately thirty days after entry of an order, so that the accrual of post-petition obligations at locations the Debtor cannot service profitably stops rather than continues.

40.     The Debtor asks that the disposition of the equipment at those locations be addressed separately and on that same timetable. The laundry equipment installed at the locations being exited has value, and that value depends on the machines remaining installed and in service rather than being removed. During the interval before rejection takes effect, the Debtor will offer the equipment for sale to the building owners and to successor operators, subject to the liens asserted against it and to any further order of this Court. The Debtor will report the results before confirmation. It would not be a sound exercise of the Debtor's business judgment to abandon property of this kind without first testing whether anyone will pay for it, and the Debtor does not propose to do so.

## ARGUMENT

### POINT I

### THE MOTION SHOULD BE DENIED BECAUSE EACH GROUND

**ASSERTED HAS BEEN CURED OR IS WITHOUT MERIT**

A.      THE PLAN DEFICIENCY IS BEING CURED BY THE AMENDED PLAN

41.      The United States Trustee's first ground is that the plan the Debtor filed did not satisfy the statutory requirements because it contained neither a liquidation analysis nor projections. The Debtor does not dispute that those elements were absent from the First Amended Plan [ECF No. 53].

42.      The Debtor's Second Amended Subchapter V Plan is being filed contemporaneously herewith. It includes (a) the liquidation analysis required by section 1190(1)(B) of the Bankruptcy Code, demonstrating that each holder of a claim will receive not less than it would receive in a chapter 7 liquidation, and (b) the projections of the Debtor's ability to make payments required by section 1190(1)(C), supporting feasibility under section 1191(c)(3). The Second Amended Plan is funded by the proceeds of the two sales described above, the payments due under the two purchase money notes, and the Debtor's projected disposable income from the operations the Debtor is retaining. The deficiency the United States Trustee identified is therefore cured, and it is cured by a document on the docket rather than by a promise.

B.      THE MONTHLY OPERATING REPORTS ARE CURRENT

43.      The United States Trustee's second ground is the untimeliness of the Debtor's monthly operating reports. The Debtor acknowledges that certain reports were not filed when due, does not minimize the importance of timely reporting, and does not quarrel with the authority the United States Trustee cites.

44.      All monthly operating reports required to date are on file. The Debtor filed its report for February 2026 on March 8, 2026 [ECF No. 48] and refiled it, together with its reports for March

2026 and April 2026, on June 25, 2026 [ECF Nos. 65, 66, 67]. It filed its report for May 2026 on June 26, 2026 [ECF No. 68], and its report for June 2026 on July 28, 2026 [ECF No. 74]. The Debtor's accountant, Michael P. Bronstein, CPA, whose retention was approved by order entered June 1, 2026 [ECF No. 61], has instituted a month end closing procedure under which each report will be prepared and transmitted to counsel for filing within the period prescribed. The Debtor's reporting obligations are current, and they will remain so.

## C.    THERE IS NO CONTINUING LOSS TO THE ESTATE

45.    The United States Trustee's third and principal ground is that the Debtor is suffering a continuing loss to or diminution of the estate with no reasonable likelihood of rehabilitation. 11 U.S.C. § 1112(b)(4)(A). That contention rests on the growth of the figure reported at Line 24 of the Debtor's operating reports, from $29,905.00 in February 2026 to $85,844.02 in May 2026. The premise of the argument is that the Debtor is falling behind on its obligations generally. It is not.

46.    The Debtor raised this point on the record before the Supplement was written. At the July 8, 2026 hearing, in the colloquy that prompted the Court's direction, counsel advised the Court that the Debtor was awaiting a proper valuation of its equipment for purposes of the amended plan, and added: "I think that it'll show that the payables are a lot less than what is showing right now on the monthly operating reports." Tr. of July 8, 2026 Hearing at 13:20 to 25. That is what the reports, read with Exhibit E, now show. The Debtor could not demonstrate it on July 8. It can now.

47.    The Line 24 figure is a running cumulative total rather than a balance owed at month end, and the Debtor's reports say so on their face. Exhibit E to each report states two distinct figures:

the amount unpaid for the month, under the heading "Unpaid Totals," and, separately, a running sum. The monthly amounts are $29,905.00 for February 2026, $29,537.34 for March, $28,772.34 for April, $27,584.34 for May, and $27,584.34 for June. The amount unpaid has declined in every successive month. The running sums are $29,537.34 at March, $58,259.68 at April, $85,844.02 at May, and $113,428.36 at June, each increasing over the one before it by exactly $27,584.34.

48.    Exhibit E also identifies what the unpaid amount consists of. For each month it reports rent unpaid and loan payments unpaid separately. The loan component is $26,902.92 in February and $27,584.34 in each of March, April, May, and June. That is the Debtor's monthly obligation to Eastern Funding LLC. The rent component is $3,002.08 in February, $1,953.00 in March, $1,188.00 in April, and zero in May and zero in June. The Debtor eliminated its post-petition rent arrears during the very period the United States Trustee examined, and has remained current with its building owners since.

49.    The explanation is straightforward. The Debtor remained current with Eastern Funding through February 2026 and has since suspended payment pending resolution of its claim, which the Debtor disputes. Eastern Funding's monthly obligation is $27,584.34, which is why the cumulative figure grows by that amount and by no other amount each month. It is not a measure of deteriorating operations. It is the arithmetic of a single disputed obligation accruing, recorded in a column that adds rather than restates.

50.    The consequence for the Supplement is decisive. Paragraph 8 of the Supplement states that "as of May 2026, the Debtor failed to pay $85,844 in post-petition expenses and had on hand $33,086," and reasons that the Debtor could not have paid what it owed even if it collected its

receivables in full. The comparison sets four months of accumulated accrual against a single month's cash. The amount actually unpaid at May 31, 2026 was $27,584.34. Cash on hand that day was $33,026.77. The Debtor could have paid the entire balance and retained a cushion. At June 30, 2026 the amount unpaid was again $27,584.34 and cash on hand had risen to $53,325.13 [ECF No. 74]. Two subsidiary observations bear on the same reading. The Supplement states at paragraph 7 that the Debtor's receivables "remained consistent at approximately $10,000 a month"; Line 25 of the April 2026 report is $52,216.53. The same paragraph describes a pattern of increase running from February to March, but the figures it recites for those two months, $29,905 and $29,537, reflect a decline of $367.66.

51.    The Debtor does not offer this as criticism of the United States Trustee, who read the Debtor's own report as it was written. The Debtor accepts responsibility for a presentation that invited the reading, and its accountant will report Line 24 as a month end balance going forward.

52.    The dispute with Eastern Funding is substantial, and it is the largest single determinant of what the Debtor must pay under any plan. The Debtor scheduled fifteen separate obligations to Eastern Funding LLC, aggregating $430,590.77, and scheduled every one of them as disputed. A claim scheduled as disputed is not deemed filed under section 1111(a) of the Bankruptcy Code, and Bankruptcy Rule 3003(c)(2) therefore required Eastern Funding to file a proof of claim in order to be treated as a creditor. It filed Claim No. 18 on February 7, 2026, thirty-eight days after the December 31, 2025 bar date. No motion to extend has been made and no showing of excusable neglect has been offered. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993).

53.    The claim also does not reconcile, either to the Debtor's schedules or to its own

attachments. It asserts $500,000.00, a round sum that appears identically in five separate boxes on the form, as the amount of the claim, as the amount asserted to be secured, as the value of the property securing it, and as the amount necessary to cure. It states an interest rate of zero percent. It attaches twenty promissory notes with original principal amounts aggregating $1,415,623.18, and it offers no itemization allocating the $500,000.00 among them, no payment history, and no explanation of the relationship between the twenty notes attached and the fifteen obligations scheduled. The Debtor will object to the claim and will ask that it be reconciled loan by loan and valued under section 506(a) of the Bankruptcy Code according to the collateral securing each obligation. Until that is done, neither the amount of the claim nor the portion of it entitled to secured treatment can be determined.

54.     The Debtor's other obligations are being met, and here too the reports are the evidence. Exhibit E to the June 2026 report shows rent paid of $23,489.51 in June and rent unpaid of zero in both May and June. The same exhibit shows rent unpaid of $1,953.00 in March and $1,188.00 in April, arrears the Debtor eliminated during the period covered by the reports rather than allowed to grow. The Debtor's accountant advises that the Debtor's obligations to Lux Clean and to Alliance are being paid, that the Debtor is paying health insurance for its employees, and that its other ordinary course obligations are being paid as they come due. Counsel to 50 Brompton Owners Corp. has advised the Court that the Debtor is not paying all of its post-petition obligations. As to post-petition rent, the Debtor's own reports do not bear that out, and the Debtor is prepared to produce its schedule of rent payments by building.

55.     The measure that bears on continuing loss is cash, and it points in the opposite direction. The Debtor began March 2026 with $26,631.26 on hand. Its cash position over the four months

for which reports have been filed since is as follows:

| Month | Net Cash Flow | Cash on hand at Month End |
|---|---|---|
| March 2026 | $         (4,759.80) | $         21,871.46 |
| April, 2026 | $         18,075.90 | $         39,947.36 |
| May, 2026 | $         (6,920.59) | $         33,026.77 |
| June, 2026 | $         20,298.36 | $         53,325.13 |
| Aggregate Mar. through June 2026 | | $         26,693.87 |
| | | |

56.     The Debtor does not obscure what these figures reflect. It is not paying Eastern Funding LLC, and if it were paying that obligation at the contract rate of $27,584.34 per month, its cash flow would be negative. The Debtor states that plainly because the arithmetic is available to anyone reading the reports, and because the answer to it is not arithmetic but law. Eastern Funding asserts a secured claim that the Debtor disputes as to amount, as to allowance, and as to the extent to which it is secured. The Debtor is not obliged to service a disputed prepetition obligation on its contract terms during the pendency of this case, and Eastern Funding has neither sought relief from the automatic stay nor moved for adequate protection. A debtor that could pay its prepetition secured debt on the original terms would have no occasion to reorganize. The premise of chapter 11 is that it cannot, and the function of a plan is to fix what it must pay instead.

57.     That is why the accrual reflected at Line 24 is not a diminution of the estate. Under section 506(a) of the Bankruptcy Code, Eastern Funding's claim is secured only to the extent of the value of the collateral securing it, and the unpaid contract installments do not enlarge that claim beyond that value. What the Debtor will pay is not $27,584.34 per month. It is the amount

the Court determines to be the allowed secured claim, paid over a term the plan fixes. The Second Amended Plan proposes to amortize that obligation over a period matched to the remaining useful life of the equipment rather than over the contract schedule, which materially reduces the required monthly payment. Whether the resulting plan is feasible is a question under section 1129(a)(11), to be decided at confirmation on the projections annexed to the Plan. It is not a reason to convert the case before those projections are before the Court.

58.    June 2026, the most recent completed month, produced net cash flow of positive $20,298.36 on receipts of $98,685.20 [ECF No. 74]. The estate is not shrinking. It is accumulating cash while a single disputed secured obligation accrues in a column that adds rather than restates.

59.    Section 1112(b)(4)(A) requires both a continuing loss *and* the absence of a reasonable likelihood of rehabilitation. Even if the Court were to find a continuing loss, the second element is absent.

60.    Rehabilitation here does not depend on speculation. It depends on four things, each of which is either done or in motion: two definitive sale agreements with an identified purchaser at fixed prices; a motion seeking approval of those sales, filed contemporaneously herewith; the exit from the locations the Debtor has determined it cannot service profitably, which removes their cost from operations; and the resolution of the Eastern Funding claim, which is the single largest determinant of what the Debtor must pay under any plan. If that claim is disallowed as untimely, or reconciled to the obligations actually scheduled, allocated among them, and valued under section 506(a) of the Bankruptcy Code according to the collateral securing each, the Debtor's monthly obligation falls materially.

61.     The authority the United States Trustee cites does not carry it further. *In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003), describes rehabilitation as putting the debtor back in good condition and reestablishing a sound basis, and adopts the formulation that rehabilitation implies establishing a cash flow from which current obligations can be met. That test is satisfied here. Every current obligation of the Debtor is being met out of operations. The one exception is a disputed claim on which payment has been suspended by choice and as to which the holder has sought no relief, and the Debtor's cash position has improved throughout the period of that suspension. A debtor that is paying its landlords, its vendors, and its employees' health insurance out of operating receipts, while its cash on hand doubles, is not a debtor without a reasonable likelihood of rehabilitation.

### D.     THE DEBTOR CAN FUND THE PLAN

62.     At the July 8, 2026 hearing counsel for the United States Trustee observed that the plan then on file appeared to require payments of approximately $90,000 per year, or $7,500 to $8,000 per month, derived from the projected disposable income figures for Class 1 and Class 1A, while candidly noting that she could not say those figures were accurate. Tr. of July 8, 2026 Hearing at 12:9 to 16. The observation was fair as to the plan then on file. That plan is superseded.

63.     The Debtor's answer is arithmetic rather than argument. Its net cash flow over the four months for which reports have been filed since March 2026 averaged approximately $6,673 per month, and in June 2026 it was $20,298.36. To that the sales add $25,000 in cash at closing, a further $5,000 forty-five days after closing, and $2,622.46 per month for thirty-six months, aggregating $94,408.56 over the term of the two notes. The transfer of the six locations also

relieves the Debtor of the rent and service obligations at those locations, and the exit from the balance of the locations the Debtor cannot service profitably removes their cost as well. What remains to be determined is not the Debtor's resources but the size of the obligation those resources must service, and that turns on the allowed amount of the Eastern Funding claim, the extent to which it is secured under section 506(a) of the Bankruptcy Code, and the term over which it is amortized. The Second Amended Plan sets out the Debtor's projections. Whether they satisfy section 1129(a)(11) is a question for confirmation.

64.    The composition of the general unsecured pool also bears on what the Plan must distribute. Of the $600,377.37 of filed general unsecured claims, approximately $474,911.73, or seventy-nine percent, consists of claims filed by building owners and route counterparties. The treatment of those claims depends on the disposition of the underlying agreements. Where the Debtor assumes an agreement, the counterparty's claim is satisfied through the cure paid under section 365(b)(1) of the Bankruptcy Code rather than through a pro rata distribution. Where the Debtor rejects, the claim remains a general unsecured claim and shares ratably with the others. The Debtor is reconciling each of those claims against the agreement to which it relates, and the Second Amended Plan identifies the disposition of each agreement and the class in which each claim is treated.

## POINT II
### SECTION 1112(b)(2) BARS RELIEF ON THE REPORTING AND PLAN GROUNDS

65.    Even where cause is established, section 1112(b)(2) provides that the court may not convert or dismiss if it finds and specifically identifies unusual circumstances establishing that conversion or dismissal is not in the best interests of creditors and the estate, and the debtor

establishes that (a) there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time, and (b) the grounds for relief include an act or omission of the debtor, *other than under section 1112(b)(4)(A)*, for which there exists a reasonable justification and which will be cured within a reasonable period of time fixed by the court. 11 U.S.C. § 1112(b)(2).

66.    The Debtor invokes section 1112(b)(2) as to the grounds asserted under sections 1112(b)(4)(F) and (J), the operating reports and the contents of the plan, and defeats the ground asserted under section 1112(b)(4)(A) on its merits, for the reasons set forth in Point I.C above.

67.    The unusual circumstances here are specific and they postdate the Motion. Since the Motion was filed on January 2, 2026, the Debtor has identified a purchaser for a substantial portion of its operations, negotiated two asset purchase agreements at an aggregate price of $117,500, reconciled the cure obligations at the affected locations and restructured the transaction so that the estate retains approximately $100,000 of that consideration rather than approximately $10,000, increased its cash on hand from $26,631.26 at March 1, 2026 to $53,325.13 at June 30, 2026, eliminated its post-petition rent arrears, brought its operating reports current, and filed a plan containing the liquidation analysis and projections the United States Trustee identified as missing. Conversion would put a chapter 7 trustee to the task of removing laundry equipment from the basements of residential buildings, which for the reasons set forth in the liquidation analysis annexed to the Second Amended Plan would produce nothing for general unsecured creditors. Dismissal would end the sale and return every creditor to its state law remedies against a company with no cash. Neither is in the best interests of creditors and the estate.

68.     As to the grounds asserted under sections 1112(b)(4)(F) and (J), both elements of section 1112(b)(2) are satisfied. There is a reasonable likelihood that a plan will be confirmed within a reasonable period of time, because the Debtor has filed one and seeks no extension of the September 8, 2026 date this Court has already fixed. Both omissions are justified and both are cured. The delay in the operating reports is attributable to the timing of the Debtor's retention of an accountant, whose employment was approved on June 1, 2026 [ECF No. 61], and all reports through June 2026 are now on file. The omissions from the plan are cured by the Second Amended Plan filed contemporaneously herewith. Nothing remains to be cured within a period the Court would need to fix.

**POINT III**

**CONVERSION OR DISMISSAL WOULD HARM, NOT BENEFIT, CREDITORS**

69.     Section 1112(b)(1) directs that, where cause is established and section 1112(b)(2) does not apply, the court shall convert or dismiss, whichever is in the best interests of creditors and the estate. The best interests inquiry is therefore central even if the Court were to find cause, and here it counsels against both remedies. The showing set forth below is also the showing of unusual circumstances required by section 1112(b)(2), discussed in Point II above.

70.     Conversion would destroy the transactions now before the Court, and would do so at a cost worth stating precisely. The value of laundry equipment lies almost entirely in its being installed and in service. A washer or dryer in an operating laundry room generates revenue and is worth what that revenue stream is worth. The same machine removed from the room is worth a fraction of that, and the cost of removal falls on whoever removes it. The Purchaser is paying for operating installations, not for hardware, and it is paying $117,500 for six of them.

71.     A chapter 7 trustee cannot operate coin and card operated laundry routes in occupied residential buildings. The building agreements would be at risk of termination or deemed rejection if not timely assumed. The machines would be stranded in buildings whose owners want them gone, and the estate would be liquidating used equipment, at its own cost of removal, against asserted secured claims of approximately $663,000. The going concern premium that makes this transaction worth anything to the estate would be gone. The counterparties whose agreements are assumed and cured under the proposed structure would instead hold unsecured claims, and the general unsecured body would in all likelihood receive nothing. That is the conclusion of the liquidation analysis annexed to the Second Amended Plan, and it is what the Court would be choosing if it converted this case.

72.     Dismissal would be no better. It would return creditors to their state law remedies and a race to the courthouse, in which the parties with the most immediate leverage would recover and the general unsecured body would not. It would also end the sale, because there would be no estate to sell and no order to sell free and clear.

73.     The transaction before the Court is the only path that produces a meaningful distribution to unsecured creditors. It is documented, it is priced, the purchaser is identified, and the motion to approve it is before the Court. The Debtor has kept the Subchapter V Trustee apprised of the sale process throughout.

<u>**CONCLUSION**</u>

**WHEREFORE**, the Debtor respectfully requests that the Court deny the Motion or, in the alternative, adjourn the Motion to a control date to be heard together with the Debtor's motion to approve the sales, on such schedule for further submissions as will afford the United States Trustee and other parties in interest a fair opportunity to respond to the matters raised herein, and grant such other and further relief as the Court deems just and proper.

Dated: Rockville Centre, New York
　　　　July 28, 2026　　　　　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　　　　　LAW OFFICES OF CHARLES WERTMAN P.C.

*By:  /s/ Charles Wertman*
Charles Wertman, Esq.
100 Merrick Road, Suite 304W
Rockville Centre, New York 11570
Tel: (516) 284-0900
charles@cwertmanlaw.com
        Attorneys for the Debtor and
        Debtor in Possession